**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

|  |  |
|---|---|
| STUART LEE KLINGBEIL,<br><br>                    Claimant,<br><br>vs.<br><br>ANDREW M. SAUL,<br>Commissioner of Social Security,[1]<br><br>                    Commissioner. | No. 18-CV-4075-LTS<br><br><br>**REPORT AND RECOMMENDATION** |

_____

     Plaintiff, Stuart Lee Klingbeil ("Claimant"), seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that he was not disabled. For the reasons that follow, I recommend that the District Court **affirm in part and reverse in part** the Commissioner's decision.

## I.      BACKGROUND

     I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 12) and only summarize the pertinent facts here. Claimant was born on June 29, 1968. (AR[2] at 41.) Claimant has a high school education. (*Id.*) Claimant allegedly became disabled

---

[1] After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit.
[2] "AR" cites refer to pages in the Administrative Record.

due to a stroke, a heart murmur, high blood pressure, and "no balance." (*Id*. at 270.) The alleged onset of disability date was February 11, 2015. (*Id*. at 266.) Claimant filed applications for Social Security disability benefits and SSI on June 2, 2015. (*Id*. at 241-56.) Claimant was initially denied benefits on December 3, 2015. (*Id*. at 145-50.) Claimant filed for reconsideration on February 4, 2016 and reconsideration was denied on March 15, 2016. (*Id*. at 152-66.) Claimant filed a Request for Hearing on April 7, 2016. (*Id*. at 167-69.) On August 28, 2017, a video hearing was held with Administrative Law Judge ("ALJ") Anthony Saragas and Vocational Expert ("VE") Stephen Schill in Omaha, Nebraska and Claimant and his then-counsel Bryan J. Arneson in Sioux City, Iowa. (*Id*. at 34-76.) Claimant and the VE both testified. (*Id*. at 41-75.)

The ALJ entered an unfavorable decision on November 28, 2017. (*Id*. at 7-22.) Claimant timely appealed the ALJ's decision and on June 29, 2018, the Appeals Council found there was no basis to review the ALJ's decision. (*Id*. at 1-3.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On September 4, 2018, Claimant timely filed his complaint in this Court. (Doc. 4.) All briefs were filed by April 9, 2019. On April 10, 2019, the Honorable Leonard T. Strand, Chief United States District Court Judge, referred the case to me for a Report and Recommendation.

## II. DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996)); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic

work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.     *The ALJ'S Findings*

The ALJ made the following findings at each step regarding Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since February 11, 2015, his alleged onset date. (AR at 12.)

At step two, the ALJ found that Claimant had the following severe impairments: "hypertension, coronary artery disease, status-post cerebral vascular accident, obesity, hyperlipidemia, chronic kidney disease, history of intracranial hemorrhage and cranial meningioma, depression, panic disorder, anxiety, post-traumatic stress disorder (PTSD), and mild neurocognitive disorder." (*Id.*) The ALJ also found that Claimant had the following nonsevere impairments: psoriasis and gastroesophageal reflux. (*Id.* at 13.)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations. (*Id.*) Specifically, the ALJ considered listings 6.05, 12.02, 12.04, and 12.06 (chronic kidney failure; neurocognitive disorders; depressive, bipolar, and related disorders; and anxiety and obsessive compulsive disorders). (*Id.* at 13-15.)

The ALJ also opined that there are no listing criteria for obesity impairments and that Claimant's "obesity is not attended with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in the listings found in any

musculoskeletal, respiratory, or cardiovascular body system listing affected by obesity."

(*Id.* at 13.)  Similarly, the ALJ opined that

> [w]hile there is not a specific Listing for hypertension or hyperlipidemia, the Listing in 4.00(H)(l) and (H)(7) notes that hypertension and hyperlipidemia, because of their systemic nature, will be evaluated by reference to specific body systems affected under these Listings. . . .  There is no evidence in the medical file of a specific body system so affected as to meet a listing. Therefore, the claimant's hypertension and hyperlipidemia do not meet any Listing.

(*Id.*)  At step four, the ALJ found that Claimant had the RFC to perform a reduced range of sedentary work with the following restrictions:

> [H]e can occasionally balance, stoop, kneel, crouch, crawl or climb ramps or stairs; and he must not climb ladders, ropes or scaffolds. He must not be around workplace hazards, such as moving mechanical parts or unprotected heights; and should not have exposure to extreme temperatures or pulmonary irritants, such as dusts, odors, gasses, or fumes. He should not perform more than frequent fingering, feeling and handling with the left non-dominant upper extremity.  In addition, he can do no more than occasional pushing or pulling or operation of foot controls with the lower left extremity. He is limited to no more than frequent visual accommodation or sharp focus. Further, he would require a cane for ambulation. Mentally, he would be limited to simple routine repetitive tasks and instructions. He can have no more than occasional social interaction with coworkers, supervisors and the public; and can have only occasional changes in the workplace environment or routine. Lastly, he cannot engage in assembly line, fast-paced, high production, quota type work.

(*Id.* at 15.)  The ALJ also found that Claimant was not capable of performing his past relevant work as a janitor, kitchen supervisor, machine operator, and trainer.  (*Id.* at 20.)

At step five, the ALJ found in the alternative that there were other jobs that existed in significant numbers in the national economy that Claimant could perform, including

addresser, document preparer, and polisher of eye frames. (*Id.* at 21.) Therefore, the ALJ concluded that Claimant was not disabled. (*Id.* at 22.)

**B.     *The Substantial Evidence Standard***

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

**C.  *Duty to Develop the Record***

The administrative hearing is a non-adversarial proceeding, and the ALJ has a duty to "fully develop the record." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). Because the ALJ

has no interest in denying Social Security benefits, the ALJ must act neutrally in developing the record. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (citing *Richardson v. Perales*, 402 U.S. 389, 410 (1971)); *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994) (opining that "[t]he goals of the [ALJ] and the advocates should be the same: that deserving claimants who apply for benefits receive justice") (quoting *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988)) (bracketed information added) .

## III.    DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) improperly weighing the opinion of Claimant's treating physician, Dr. Meis; (B) improperly evaluating Claimant's credibility; and (C) relying on a hypothetical that was not supported by the record.    (Doc. 13 at 1.)    I will address each of Claimant's arguments in the order presented.    The weight the ALJ gave Dr. Meis's opinion and how the ALJ weighed Claimant's subjective complaints was reflected in the hypothetical presented to the VE.

*A.    The ALJ properly evaluated the opinion of Claimant's treating physician.*

Claimant argues that the ALJ improperly weighed the opinion evidence in his case. Specifically, Claimant takes issue with the ALJ giving little weight to Dr. Meis's opinion, while giving great weight and partial weight to other opinions in the record. The following physicians provided medical opinions in this case.

### 1.    Dr. Steven Meis

Dr. Meis has been Claimant's primary care physician for over twenty years.  (AR at 1148.)    On March 4, 2106, Dr. Meis wrote a "To Whom it May Concern" letter stating that Claimant had "uncontrolled hypertension, with subsequent hemorrhagic stroke.  The stroke has resulted in significant disability, with difficulty with ambulation, memory problems, and increased anxiety and depression symptoms." (*Id.* at 1147.)  Dr. Meis also stated that "[a]t this point, he is unable to return to work and it is uncertain if he ever will be able to recoup his losses from the stroke." (*Id.*)

On August 1, 2017, Dr. Meis completed a check-box, fill-in-the-blank form opinion stating that Claimant has all of the following symptoms: "balance problems, poor coordination, loss of manual dexterity, weakness, slight paralysis, unstable walking, falling spells, numbness or tingling, pain, fatigue, vertigo/dizziness, headaches, difficulty remembering, confusion, depression, emotional lability, difficulty solving problems, problems with judgment, double or blurred vision, and speech/communication difficulties." (*Id.* at 1148.) In Dr. Meis's opinion, Claimant's maximum ability to stand and walk during an 8-hour workday would be about two hours, Claimant's maximum ability to sit at one time is ten-to-fifteen minutes, and Claimant's ability to stand at one time is five-to-ten minutes. (*Id.* at 1149.)

According to Dr. Meis, Claimant is limited to lifting and carrying up to ten pounds occasionally and up to 50 pounds rarely. (*Id.* at 1150.) Dr. Meis opined that Claimant could never twist, crouch/squat, or climb ladders; could occasionally climb stairs; and would have significant limitations with reaching, handling and fingering with his left hand and arm. (*Id.*) Dr. Meis also opined that Claimant had environmental restrictions related to heat, cold, humidity, fumes, and dust. (*Id.*) Based on these restrictions, Dr. Meis concluded that Claimant was capable of low stress work, that he was likely to be "off task" 25% or more of a typical work day due to his impairments, and that Claimant would likely miss on average more than four days of work a month. (*Id.* at 1151.) Dr. Meis provided no support or citations to medical records for any of his conclusions. The only note Dr. Meis wrote was when asked to describe other limitations that would affect Claimant's ability to work at a regular job on a sustained basis. Dr. Meis wrote: "High levels of Anxiety . . . memory and task management poor with increased stress due to above." (*Id.*)

The ALJ gave Dr. Meis's opinion little weight. Dr. Meis's opinion will be discussed below.

## 2. Consulting Psychologist Anthony T. Larson, Psy.D., L.P.

On November 19, 2015, Dr. Larson examined Claimant to help determine his eligibility for benefits. Dr. Larson found that Claimant's depression and anxiety screenings were both positive and that Claimant reported symptoms that corresponded to both of these conditions. (*Id.* at 929.) In relevant part, Dr. Larson diagnosed Claimant with major depressive disorder, a panic disorder, PTSD related to a car accident, generalized anxiety disorder, and mild vascular neurocognitive disorder. (*Id.* at 929-30.)

Dr. Larson opined that Claimant's anxiety and cognitive issues are most likely to be problematic in the workplace. (*Id.* at 931.) However, Dr. Larson also opined that Claimant "should be able to understand and carry out instructions, interact appropriately with others, exercise proper judgment, and remain flexible in the workplace." (*Id.*)

The ALJ gave Dr. Larson's opinion "great weight" because Dr. Larson's opinion was "consistent with the record as a whole." (*Id.* at 19.)

## 3. State Agency Medical Consultants Donald Shumate, D.O. and Michael Finan, M.D.

On September 14, 2015, state agency medical consultant Donald Shumate, M.D. reviewed the record and opined that Claimant had the RFC to occasionally lift and/or carry 20 pounds; frequently lift and/or carry ten pounds; stand or/or walk six hours in an eight-hour day; sit six hours in an eight-hour day; occasionally balance, stoop, kneel, crouch, and climb ramps and stairs; and do unlimited pushing and/or pulling with the lifting limits provided above. (*Id.* at 86-87.) Dr. Shumate also opined that Claimant had no manipulative, visual, communicative, or environmental limitations, but that Claimant should avoid concentrated exposure to hazards such as machinery and heights due to balance issues caused by the effects of a stroke, obesity, and a mitral valve repair. (*Id.* at 87-88.) On March 11, 2016, state agency medical consultant Michael Finan, M.D. affirmed Dr. Shumate's opinion. (*Id.* at 122.) The

ALJ gave these opinions partial weight because they were not consistent with the record as a whole. (*Id.* at 18-19.) Specifically, the ALJ gave great weight to the postural and environmental limitations in the opinions because they were supported by the record. (*Id.* at 19.) However, the ALJ gave little weight to the opinion that Claimant is capable of light exertional work, the work that corresponded to the RFC limitations Drs. Shumate and Finan assigned, because evidence received at the hearing demonstrated that Claimant "had more limitations than those assessed by the medical consultants." (*Id.*)

### 4. *State Agency Psychological Consultants Russell Lark, Ph.D. and Scott Shafer, Ph.D.*

State agency psychological consultant Russell Lark, Ph.D. reviewed the record and opined on December 2, 2015, in relevant part, that although Claimant does have mental health diagnoses, Claimant has no social interaction restrictions and can handle most daily responsibilities.[3] (*Id. at* 123-24.) Dr. Lark further opined that although Claimant's memory, attention, concentration, and pace may vary, they are "adequate for at least simple/routine tasks" and that Claimant "is able to complete simple, repetitive tasks on a sustained basis." (*Id. at* 124.) On March 15, 2016, state agency psychological consultant Scott Shafer, Ph.D. reviewed this opinion. Dr. Shafer noted that Claimant's most recent medical records indicated that Claimant's medical examinations showed he had no problems with his mental health and was not taking any anxiety medications. (*Id.*) He therefore affirmed the original decision.

The ALJ assigned the opinion partial weight because it was "not consistent with the record as a whole." (*Id.* at 19.) The ALJ gave great weight to the opinion that

---

[3] The ALJ mistakenly attributes Dr. Lark's opinions to Dr. Shafer. (AR at 19.) I find this to be a harmless typographical error. Dr. Shafer affirms Dr. Lark's opinion and only adds a single paragraph of new explanatory information. (*Id.* at 124, 141.) The information upon which the ALJ relies in his decision is all contained in Dr. Lark's original opinion.

Claimant had severe mental limits. (*Id.*) However, the ALJ gave "less weight" to the opinion that Claimant has no social limitations because Claimant's Adult Function Report and hearing testimony demonstrated that Claimant has some social limitations. (*Id.*)

### 5. *Third Party Function Report of Heidi Klingbeil, Claimant's Wife*

On August 2, 2015, Ms. Klingbeil completed a Third Party Function Report in which she stated that Claimant does not handle stress well; that he occasionally uses a cane for ambulation; and that due to dizziness and confusion, Claimant does not drive, leave the house very often, or socialize much. (*Id.* at 307-11.) Ms. Klingbeil also stated that Claimant has frequently changing moods and "isn't always aware of how he sounds when talking, doesn't always use tact when replying." (*Id.* at 309.) She further stated that Claimant's ability to concentrate and follow instructions "depends on the day" and that Claimant's impairments affect most of his functional abilities. (*Id.*) The ALJ gave Ms. Klingbeil's statements contained in this report little weight because they were "the same types of complaints and symptoms already alleged by the claimant," and the ALJ concluded that "objective evidence provides good reasons for questioning the reliability of claimant's subjective complaints." (*Id.* at 19.)

### 6. *Analysis*

An ALJ's RFC must ordinarily be supported by a treating or examining source opinion to be supported by substantial evidence. *See Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (noting internal citations omitted)). An ALJ must "give good reasons" for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2).

"A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record as a whole.[4] *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quotation omitted). "Even if the treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (citation and brackets omitted). However, a treating physician's opinion can be given limited weight if it contains only conclusory statements, contains inconsistent opinions "that undermine the credibility of such opinions," is inconsistent with the record, or if other medical opinions are supported by "better or more thorough medical evidence." *Id.* (citations omitted).

Claimant argues that the ALJ improperly weighed Dr. Meis's opinion because Dr. Meis has "been [Claimant's] primary care doctor for in excess of 20 years. He has guided his care with the assistance of specialists as needed. . . . The ALJ gave little weight to the opinion of Dr. Meis, a long standing treating physician of Plaintiff" and more weight to the opinions of the other medical opinions in the record. (Doc. 13 at 6-7.)

When a treating physician's medical opinion is not given controlling weight, the following factors will be examined to determine the weight to give the opinion: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. 20 C.F.R. § 404.1527(c)(2).

The ALJ did not err in failing to give Dr. Meis's opinion controlling weight

---

[4] Under current regulations, a treating physician's opinion is entitled to no special deference. *See* 20 C.F.R. § 404.1520c(c). These regulations were effective as of March 27, 2017. *See* 20 C.F.R. § 404.1527. However, Claimant's claim was filed on February 11, 2015. Thus, the old regulations apply. *See id.*

because it is "inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c). The proper weight to give this non-controlling physician opinion is determined through an analysis of the six factors listed above.

Other than to restate and quote Dr. Meis's opinion and to provide the law, Claimant provides no argument on this issue other than the assertion that Dr. Meis has been Claimant's physician for a long time, as stated above.

### a. Length and Frequency of the Treatment Relationship

"When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the medical source's opinion more weight than . . . if it were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(i). Dr. Meis has been Claimant's primary care provider for over twenty years. This factor weighs in favor of affording the opinion more than little weight.

### b. Nature and Extent of the Treatment Relationship

"The more knowledge a treating source has about [a claimant's] impairment(s) the more weight the [ALJ] will give the source's opinion." 20 C.F.R. § 404.1527(c)(2)(ii). The ALJ "will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered." *Id.* Claimant saw Dr. Meis for hypertension, psoriasis, medication reviews, shoulder pain, insomnia, anxiety, depression, allergies, follow-up appointments after various hospitalizations and surgeries, and for routine immunizations. (AR at 737-39, 913-19, 971-73, 981-83, 1011-25, 1032-37, 1055-62, 1074-77, 1095-1103.) Dr. Meis did not cite any of his treatment notes to support the limitations in his opinions, although the treatment notes document long-term treatment of Claimant's hypertension, which was the cause of Claimant's stroke. Therefore, although Dr. Meis did not provide the specialized care Claimant received when he had his stroke and although Dr. Meis is not a mental health specialist,

due to his long-term relationship with Claimant and the fact that he has treated Claimant for many different issues over the decades, I find that this factor weighs slightly in favor of affording the opinion more than little weight.

### c.     *Supportability*

"The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). "A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Circuit 2006). In addition, "'[t]he checklist format, generality, and incompleteness of the assessments limit [an] assessment's evidentiary value.'" *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal brackets omitted)); *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."); *see also Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) ("[Dr. Hollis's] assessments, however, consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses. They cite no medical evidence and provide little to no elaboration, and so they possess little evidentiary value. On that basis alone, the ALJ did not err in giving Dr. Hollis's RFC assessments little weight and relying more heavily on other opinions in the record.") (internal quotations and citations omitted). Therefore, a treating source's opinion can be given limited weight if it contains only conclusory statements or inconsistent opinions "that undermine the credibility of such opinions." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quotation omitted).

Dr. Meis provided his opinions on a check-box form and in a "To Whom it May Concern" letter, neither of which provided any reasons for his conclusions or citations

to medical records to support his recommendations. Therefore, Dr. Meis's opinions are "nothing more than vague, conclusory statements" and checked boxes that "provide little to no elaboration, so they possess little evidentiary value." *Thomas*, 881 F.3d at 675; *Piepgras*, 76 F.3d at 236.

Moreover, Dr. Meis's own treatment notes do not support his opinions. Dr. Meis's March 4, 2016 opinion letter opined that Claimant had "uncontrolled hypertension" that resulted in a stroke and that the stroke "resulted in significant disability, with difficulty with ambulation, memory problems, and increased anxiety and depression symptoms." (AR at 1147.) Dr. Meis also stated that "[a]t this point, he is unable to return to work and it is uncertain if he ever will be able to recoup his losses from the stroke." (*Id.*) However, contemporaneous treatment notes indicate that Claimant was showing steady improvement at the time Dr. Meis wrote this letter. On August 28, 2015, Claimant saw Dr. Meis for a follow-up visit. (*Id.* at 971.) Dr. Meis's treatment note states that "[s]ince being at the clinic on 07/28/2015 due to hypertension and shoulder weakness, the patient reports feeling better." (*Id.*) On October 2, 2015, Claimant saw Dr. Meis for an unrelated problem and his blood pressure was normal: 110/78. (*Id.* at 982.) On November 30, 2015, Claimant's blood pressure was "up a little bit" and he had stopped one of his hypertension medications. (*Id.* at 1013.) Dr. Meis planned to see Claimant again in three weeks for a follow-up regarding anxiety medication and would check on hypertension at that time, too. (*Id.*) On December 22, 2015, Claimant attended the follow-up appointment and his blood pressure was "good." (*Id.* at 1025.) Claimant was not responding well to his new anxiety medication, so Dr. Meis made a medication change. (*Id.*) On January 12, 2016, the final treatment note before Dr. Meis wrote the letter, he noted that, in spite of having some bad days and some dizziness, Claimant "is feeling pretty good, getting stronger." (*Id.* at 1032.) Claimant was "doing fairly well in regard to his anxiety, and currently is not on any

medication but takes Lorazepam on an as-needed basis—not every day." (*Id.* at 1034.) Claimant's blood pressure "look[ed] good." (*Id.*) Accordingly, Dr. Meis's treatment notes from the time of the March 2016 letter do not provide any support for "difficulty with ambulation," "depression," or "memory problems," none of which are mentioned in the five months of treatment notes between August 2015 and January 2016. Moreover, those treatment notes demonstrate that far from being "uncontrolled," Claimant's hypertension was controlled with medication and Claimant was only taking anxiety medication on an as-needed basis, and that was not even daily.

The August 1, 2017 check-box opinion is likewise not supported by contemporaneous treatment notes. First, in spite of concluding that Claimant experiences "balance problems, poor coordination, loss of manual dexterity, weakness, slight paralysis, unstable walking, falling spells, numbness or tingling, pain, fatigue, vertigo/dizziness, headaches, difficulty remembering, confusion, depression, emotional lability, difficulty solving problems, problems with judgment, double or blurred vision, and speech/communication difficulties" (AR at 1148), there is nothing in Dr. Meis's treatment notes addressing vision issues, depression, problems with judgment, difficulty remembering, difficulty solving problems, problems with judgment, or speech/communication difficulties. In fact, Claimant specifically denied having blurred or double vision at the visits where he was asked about this. (*Id.* at 738, 837, 914, 918, 972, 982, 1012, 1023, 1059, 1075, 1102.) Moreover, the single time Dr. Meis's treatment notes document "weakness" in the musculoskeletal category of the "Review of Symptoms" part of the notes is when Claimant reported left hand shaking to Dr. Meis. (*Id.* at 1059, 1061.) This shaking is discussed below. In addition, Claimant's motor exams were consistently "grossly intact." (*See, e.g. id.* at 914, 973, 1013, 1025, 1077.) Importantly, on April 4, 2017, the last treatment note in the record before Dr. Meis wrote

this opinion, Claimant "deni[ed] abnormal gait, focal weakness[5], . . . dizziness or lightheadedness." (*Id.* at 1102.)

Second, Dr. Meis's treatment notes do not address Claimant's maximum sitting, standing, walking, lifting, and carrying capabilities. Thus, those opinions are unsupported. Dr. Meis and Claimant do not appear to have discussed Claimant's ability to engage in these activities for extended periods of time in his day-to-day life. (*See id.* at 1149-50.) The same is true for the environmental limitations that Dr. Meis noted. Nothing in his treatment notes indicated that he and Claimant ever discussed environmental issues, irritants, or limitations that affected Claimant's ability to work.

Third, for the most part, Dr. Meis's later treatment notes do not add anything significant to the analysis. On April 11, 2016, Claimant saw Dr. Meis for a three-month clinic follow-up at which it was noted that he was walking with a cane and that he was "doing some better." (*Id.* at 1058.) Dr. Meis further noted that Claimant "[had] been doing fairly well, with no large health problems." (*Id.* at 1061.) Claimant did report to Dr. Meis that his left hand will shake, which Dr. Meis said is probably a post residual effect of the stroke that will be more pronounced if Claimant is fatigued. (*Id.*) Claimant's kidney function appeared "fairly stable at [that] point." (*Id.*) On October 3, 2016, Claimant saw Dr. Meis for a medication review. (*Id.* at 1074.) His blood pressure was 120/84 and Dr. Meis stated that Claimant was "doing fairly well." (*Id.* at 1077.) His next follow-up was scheduled for six months. (*Id.*) Six months later, on April 4, 2017, Claimant denied abnormal gait, dizziness, and lightheadedness; was "doing well"; had his hypertension "under good control"; and had stable "Anxious depression." (*Id.* at 1102-03.) Dr. Meis made no medication or other changes in Claimant's treatment, other than to encourage Claimant to work on diet, exercise, and weight loss. (*Id.* at 1103.)

---

[5] Focal means "Pertaining to or occupying a focus." *Dorland's Illustrated Medical Dictionary* 723 (32d ed. 2012).

None of the other treatment notes in the record are relevant, addressing issues such as colds and allergies.

Thus, while there is one mention of a cane sixteen months before and one mention of hand shaking ten months before Dr. Meis wrote his check-box opinion, those treatment notes are hardly contemporaneous. Claimant no doubt has some issues using his left hand and he may need to use a cane for support at times. Nevertheless, Dr. Meis's own inconsistencies have "undermin[ed] his opinion and diminish[ed] or eliminat[ed] the weight given his opinions." *Hacker*, 459 F.3d at 937. Moreover, the treatment note that is closest in time to Dr. Meis's check-box opinion does not paint the dire picture that Dr. Meis gives in his opinion. To the contrary, that treatment note is rather encouraging.

Therefore, this factor should weigh in favor of giving Dr. Meis's opinion little weight.

### d. Consistency

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4).

The ALJ gave Dr. Meis's opinions little weight because they "were not fully consistent with the record as a whole." (AR at 19.) The ALJ cited treatment notes from other physicians, noting that Claimant's "physical examinations were largely normal." (*Id.*) The ALJ is correct. More importantly, as the ALJ stated, Dr. Meis's opinions are inconsistent with the record as a whole. No medical records, including Dr. Meis's treatment records, indicate that Claimant has to take 15-minute breaks and have a week off work every month. Therefore, the ALJ properly disregarded this limitation. *Porter v. Berryhill*, No. C17-0110-LTS, 2018 WL 3114533, at *8 (N.D. Iowa June 25, 2018) ("The ALJ is free to disregard those portions of a treating physician's RFC opinion that are not supported by the treatment record.")

Likewise, the record does not support Dr. Meis's assertion that Claimant has double or blurred vision. (AR at 1148.) Claimant apparently did not even have vision problems immediately after his stroke. Claimant's stroke occurred on February 11, 2015. At his March 13, 2015 follow-up appointment with Deborah A. Majerus, M.D., Claimant did not mention vision problems. (*Id.* at 460-61.) Likewise, Claimant did not mention vision complaints to any health care providers later in his recovery. (*See, e.g. id.* at 466-67 (no mention of vision), 660 ( no "complaints of . . . vision change"), 1042 ("no . . . vision change").)

However, as discussed above, there is some support in the record documenting vertigo/dizziness and Claimant's occasional use of a cane. (*Id.* at 1148.) Claimant's dizziness seems to be intermittent because Claimant mentioned it infrequently at his medical appointments, as was evident when assessing Dr. Meis's treatment notes. While medical records do indicate that Claimant experienced dizziness shortly after his stroke, Dr. Edward Zajac noted that the symptoms were the worst when Claimant moved his head rapidly and the symptoms were already resolving within the first month after the stroke. (*Id.* at 470.) Likewise, Dr. John Um stated in May 2015 that when Claimant experienced dizziness after taking diuretics, the dosage was decreased and the dizziness improved. (*Id.* at 556.) Physician's Assistant ("PA") Reuben Dennis Rieke Jr. noted on January 8, 2016 that Claimant reported that he has "poor balance, feels drunk." (*Id.* at 1028.) PA Rieke opined that the balance issues were related to a small stroke earlier that year as well as to a previous large stroke. (*Id.*) Although there are no more recent treatment notes in the record, the above indicates at least some support for Dr. Meis's opinion that Claimant experiences occasional dizziness.

Regarding Claimant's occasional use of a cane, which would lend support to Dr. Meis's opinion that Claimant is "unstable walking" (*Id.* at 1148), Dr. Majerus, stated on

April 2, 2015 that plaintiff "is using a cane, and most of the time, he does not even use that." (*Id.* at 460.) Five days later, Dr. Majerus noted that Claimant was "hardly using his cane at all." (*Id.* at 468.) On June 29, 2015, Dr. Follett, who treats Claimant for his meningioma, stated that Claimant's gait was "mildly unsteady," and that Claimant "had poor balance feels drunk." (*Id.* at 669.) Dr. Follett attributed these symptoms to Claimant's strokes. (*Id.*) As stated above, PA Rieke noted in January 2016 that Claimant stated that he felt drunk due to poor balance, something PA Rieke, who works with Dr. Follett, also attributed to strokes. (*Id.* at 1028.) Ms. Klingbeil even states that Claimant only uses a cane "occasionally," and then only when he "is tired and weak after physical therapy." (*Id.* at 310.) Thus, there is some support in the record for Claimant's occasional use of a cane.

Dr. Meis also opined that Claimant experienced weakness as a result of his impairments (*Id.* at 1148), although he also stated that Claimant could lift up to 50 pounds on rare occasions. (*Id.* at 1150). However, the record does not support a finding of weakness to the point of needing the breaks and rests contained in Dr. Meis's opinions. Claimant had generally good test results or reported no weakness to his doctors after his initial recovery from his stroke. For example, on April 13, 2015, Dr. Um documented that Claimant had good grip strength in his upper extremities bilaterally. (*Id.* at 539.) Similarly, on June 22, 2015, Claimant told J. Scott Neumeister, M.D., that he had no weakness and examination showed muscle strength of 5/5 bilaterally. (*Id.* at 662-64.) On June 29, 2015, Dr. Follett documented "good strength and sensation." (*Id.* at 669.) At a July 27, 2015 physical therapy evaluation, physical therapist Jerel Dewit found that Claimant had "near normal strength for bilateral hands for grip strength as well as for wrist and elbow strength." (*Id.* at 923.) Shoulder pain limited Claimant's shoulder strength to 3/5 and 4/5. (*Id.* at 923-24.) On October 14, 2016, Jennifer Fillaus, D.O., stated Claimant's strength and sensation were "good." (*Id.* at 1114.) At that appointment,

Claimant told Dr. Fillaus that he felt "quite well." (*Id.* at 1112.) Claimant told Dr. Larson that he could prepare "anything" to eat by himself, that he is able to help with household chores, childcare, "outside work," and laundry. (*Id.* at 928.) Claimant told the Social Security Administration ("SSA") that he needs to rest only a "few minutes or until [his] legs get steady again" if he needs a rest while walking. (*Id.* at 330.) Accordingly, there is not support in the record for the more extreme limits that Dr. Meis included in his check-box opinion.

In his August 1, 2017 check-box opinion, Dr. Meis stated that the following psychological limitations would affect Claimant's ability to work at a regular job on a sustained basis: "high levels of anxiety, patient's memory and task management [are] poor with increased stress due to the above." (*Id.* at 1151.) While Claimant does suffer from anxiety, the record does not indicate that Claimant's anxiety manifests in the need to be off task 25% of the time or to be away from work more than four days a month. In addition, the record does not support the seemingly-severe memory problems Dr. Meis alludes to in his opinion.

On March 23, 2015, shortly after Claimant's stroke, Dr. Zajac described Claimant's psychiatric state as: "memory intact; affect appropriate." (*Id.* at 471.) On April 13, 2015, Dr. Um documented that Claimant was "alert and oriented x3."[6] (*Id.* at 539.) On May 8, 2015, R.N. Sandy Miller found that Claimant's "overall mental status is good." (*Id.* at 602.) On June 22, 2015, Dr. Neumeister documented that Claimant was alert and oriented x3, was in no acute distress, and was cooperative. (*Id.* at 664.)

---

[6] Orientation is "[t]he awareness of one's environment, with reference to place, time, and people." *Id.* at 1335. It is a term "that encompasses a person's awareness of herself, those around her, her location and the date and time." NCBAC (Nat'l Cert. Bd. for Alzheimer & Aging Care), What Does Oriented x1, x2, x3, and x4 Mean in Dementia?, Oct. 18, 2017, https://ncbac.net/news/2017/10/18/what-does-oriented-x1-x2-x3-and-x4-mean-in-dementia.

On June 29, 2015, Dr. Follett documented clear and appropriate speech, good mentation,[7] and normal mood and affect. (*Id.* at 669.)

On November 19, 2015, Dr. Larson noted that throughout his assessment, Claimant was "cooperative with a euthymic demeanor,"[8] his speech and thoughts were lucid and goal-directed, he was able to stay on topic, and his mood and affect were appropriate for the topics under discussion. (*Id.* at 928.) Dr. Larson opined that although Claimant's short- and long-term memory and concentration appeared to be "somewhat impaired," he was alert and oriented to person, place, time, and situation. (*Id.*) Dr. Larson further opined that while Claimant's anxiety symptoms could make it difficult for him to work effectively, he should be able to understand instructions, procedures, and locations, and have the ability to carry out instructions and procedures. (*Id.* at 929.) Moreover, Dr. Larson noted that Claimant could interact appropriately with supervisors, coworkers, and the public; use good judgment; and respond to changes. (*Id.* at 929, 931.) Finally, Dr. Larson noted that the prognosis for Claimant's mental health issues was good with appropriate treatment. (*Id.* at 931.)

In January 6, 2016, P.A. Rieke documented clear and appropriate speech, good mentation, and normal mood and affect. (*Id.* at 940.) Likewise, on May 17, 2016, Dr. Fillaus noted that Claimant was alert and oriented with a cooperative and appropriate affect. (*Id.* at 1108-09.) On October 14, 2016, she stated that Claimant's affect was "cooperative and appropriate." (*Id.* at 1112.)

Thus, the record as a whole demonstrates that while Claimant has some limitations, they are not as debilitating as Dr. Meis claims in his opinions. Therefore,

---

[7] Mentation is "[t]he process of reasoning and thinking." *Stedman's Medical Dictionary* 1185 (28th ed. 2006).

[8] Euthymia is "a state of mental tranquility and well-being; neither depressed nor manic." *Dorland's*, *supra* note 5, at 655.

the record as a whole does not support Dr. Meis's opinions and this factor weighs in favor of affording the opinion little weight.

### e. Specialization

"[The ALJ will] generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Dr. Meis is Claimant's general practitioner. The record does not indicate if he has a specialty in family medicine, internal medicine, or any other specialty. The ALJ found that Claimant suffers from the following severe impairments: hypertension; coronary artery disease, status-post cerebral vascular accident; obesity; hyperlipidemia; chronic kidney disease; history of intracranial hemorrhage and cranial meningioma; depression; panic disorder; anxiety; PTSD; and mild neurocognitive disorder. (AR at 12.) The ALJ also found that Claimant had the following nonsevere impairments: psoriasis and gastroesophageal reflux. (*Id*. at 13.) Dr. Meis is not a specialist in cardiology, nutrition, nephrology, neurology, psychology, or psychiatry, to name some of the specialists who would address the above impairments.

Although Dr. Meis prescribes hypertension medication and some anxiety medication for Claimant, he is not a specialist in the areas listed above. In fact, the record shows that Dr. Meis refers Claimant to specialists and communicates regularly with specialists when it comes to Claimant's specialty healthcare. Accordingly, I find this factor weighs in favor of affording the opinions little weight.

### f. Conclusion

After analyzing the foregoing five factors, I find that the ALJ conducted a proper analysis of Dr. Meis's opinion and all the medical and non-medical evidence in the record

and that substantial evidence on the record as a whole supports the ALJ's decision.[9] Therefore, I recommend that the District Court affirm the ALJ's decision on this issue.

**B.** ***The ALJ did not properly evaluate Claimant's Credibility.***

Claimant argues that the ALJ did not properly credit Claimant's subjective complaints. Specifically, Claimant avers that the ALJ "simply states 'the Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical records and other evidence in the record.'" (Doc. 13 at 8) (citing AR at 16.) Claimant asserts that the ALJ does not "clearly state which statements are inconsistent." (*Id.*) Claimant takes issue with the ALJ's reliance on all the medical evidence in the record, including opinions provided by non-examining physicians. (*Id.*)

The ALJ found that the evidence of Claimant's daily activities along with the objective medical evidence established that Claimant "has a greater sustained capacity than he alleges." (AR at 19.) The ALJ thus concluded that Claimant's "subjective complaints and alleged limitations [were] inconsistent with the record as a whole and not fully persuasive." (*Id.*)

---

[9] Claimant's brief is not clear. To the extent it argues that the ALJ did not properly weigh all the various medical opinions, I find that argument to be without merit. First, Dr. Larson is a specialist in psychology who examined Claimant. (AR at 928.) Therefore, his opinion was entitled to the great weight the ALJ assigned to it. Second, I find that the thoughtful partial weights that the ALJ assigned to the state agency physicians' and psychologist's opinions were supported by substantial evidence in the record as a whole. (*Id.* at 18-19, 86-87, 122-24.) The ALJ properly supported his decisions to give great weight to some parts of the opinions and little weight to other parts of the opinions. (*Id.* at 18-19.) Importantly, for the parts of the opinions that the ALJ assigned little weight, he replaced the opinions with greater limitations than those assigned by the physicians and the psychologist. (*Id.*) ALJs are allowed to discount treating physicians' opinions if they are contradicted by "better or more thorough medical evidence." *Smith v. Colvin*, 756 F.3d 621, 627 (8th Cir. 2014) (affirming ALJ's decision to give significant weight to state agency physical and mental assessments and reviewer's opinion and limited weight to treating physician's opinion).

When a claimant suffers from a severe impairment, but the impairment does not meet or equal a disabling impairment listed in the regulations, the ALJ "will consider the impact of [the claimant's] impairment(s) and any related symptoms, including pain, on [the claimant's] residual functional capacity." 20 C.F.R. § 404.1529(d)(4). This determination involves a two-step process in which the ALJ first decides whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms and then evaluates the intensity and persistence of the claimant's symptoms. *Id.* § 404.1529(b),(c). When evaluating the claimant's subjective complaints during the second step, the ALJ considers the objective medical evidence, the claimant's work history, and evidence relating to the following factors ("the *Polaski* factors"): (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) [the claimant's] functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).[10] An ALJ is not required to methodically discuss each *Polaski* factor as long as the ALJ "acknowledge[es] and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (*citing Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

After considering the factors and evidence, the ALJ determines the extent to which the claimant's symptoms affect the claimant's capacity to perform basic work activities. *Id.* § 404.1529(c)(4). The claimant's "symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain,

---

[10] The Code of Federal Regulations includes the additional factors of: (1) other treatment the claimant receives for pain relief; and (2) measures the claimant uses to relieve pain "(e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." 20 C.F.R. § 404.1529(c)(3)(v), (vi).

can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*

In this case, the ALJ found at the first step that Claimant had medically determinable impairments that could reasonably be expected to cause his alleged symptoms. (AR at 16.) At the second step, the ALJ found that "[C]laimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the] decision." (*Id.*) To support this determination, the ALJ stated that the objective medical evidence and medical opinion evidence was largely inconsistent with Claimant's subjective complaints. (*Id.* at 18-19.) The ALJ also noted that Claimant was achieving "excellent control" of his high blood pressure, and that Claimant received minimal treatment for this issue in 2016-17. (*Id.* at 17.)

"The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered." *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004). "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to its judgment even if every factor is not discussed in depth." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (citation omitted). I find that the ALJ did not properly acknowledge and examine the *Polaski* factors before discounting Claimant's subjective complaints.

Claimant seems to makes arguments related to two *Polaski* factors: his functional restrictions and his daily activities.[11] First, Claimant seems to argue that the ALJ

---

[11] Claimant does not object to the ALJ's other findings related to his subjective complaints and credibility. Accordingly, Claimant has waived any other arguments related to his subjective complaints and credibility. *See Gragg v. Astrue*, 615 F.3d 932, 938 (8th Cir. 2010) (noting that district court opined that although the claimant "discussed the Record at some length, he has not alleged any of the ALJ's findings regarding his physical capabilities or the effects of depression were erroneous" and holding that any arguments not properly raised at the district court level are waived on appeal) (citing *Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir.

incorrectly weighed the functional restrictions factor because the evidence demonstrates that due to his stroke he is unable to drive and has dizzy spells, memory problems, balance problems, problems standing for more than ten minutes at a time, and limited dexterity and grip with his left hand.  (Doc. 13 at 8-9.)  I find that the ALJ thoughtfully and thoroughly considered these claimed limitations, discounted some limitations, adopted limitations some into his RFC, and explained his reasons for doing so.  (AR at 17-19) (addressing medical evidence, testimony, and Claimant's submissions to the SSA).[12]   As discussed above, in so doing, the ALJ further limited the opinions of the state agency non-examining physicians and psychologist.  Thus, Claimant's argument that "the ALJ goes through the medical records in an attempt to discredit Plaintiff but has to rely upon non-examining doctors to do so" (Doc. 13 at 8) is without merit.  The ALJ's job was to examine the record as a whole.  The ALJ did this with regard to the medical evidence in the record. As discussed above, sometimes the opinions of non-examining sources are entitled to more weight than the opinions of treating sources.  *See* discussion at *supra* note 9.  I find that the ALJ properly acknowledged and examined Claimant's functional limitations.

Second, Claimant argues that "[t]he ALJ cannot rely on a claimant's limited daily activities to discredit allegations of disabling impairments." (Doc. 13 at 9.)  Claimant also argues that his ability to engage in activities for a "limited duration" does not prove he has the RFC to engage in light work.  (*Id.*)

The Commissioner concedes in his brief that "the ALJ did not discuss how [Claimant's] activities might have conflicted with claimed symptoms." (Doc. 16 at 16

1997); *Novotny v. Chater*, 72 F.3d 669, 670 (8th Cir.1995)); *see also  Aulston v. Astrue*, 277 F. App'x 663, 664-65, 2008 WL 2066019 (8th Cir. 2008) (declining to address underdeveloped argument) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (collecting cases for proposition that undeveloped arguments are waived).
[12] The ALJ refers to dizziness by the terms "balance issues," "poor balance," or similar terms.

n.12.)  The ALJ did state that Claimant's "daily activities along with the objective medical evidence discussed . . . establish[ed] that the claimant has a greater sustained capacity than he alleges."  (AR at 19.)  However, the ALJ did not conduct an analysis of this factor.  Although an ALJ is not required to discuss each *Polaski* factor, he must "acknowledge[] and consider[] the factors before discounting a claimant's subjective complaints." *Bryant v. Colvin,* 861 F.3d 779, 782 (8th Cir. 2018) (citation omitted).  Here, the ALJ did not acknowledge or consider Claimant's activities of daily living.  The ALJ did not mention Claimant's activities of daily living anywhere in his decision.

I find the omission of any mention of Claimant's daily activities when Claimant has apparently spent most of his time at home since his February 2015 stroke to be more than an "arguable deficiency in opinion-writing technique . . . [that probably] had no practical effect on the outcome of the case." *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996) (dismissing argument that district court judge focused only on the *Polaski* factors that supported the ALJ's decision) (quoting *Benskin v. Bowen*, 830 F.2d 878, 883 (8th Cir. 1987) (ellipses in original)); *See also* (AR at 307 (Ms. Klingbeil's statement that Claimant does not go out very often and goes with her to the store "maybe once a month"), 328 (Claimant's statement that he only goes out when he has an appointment).) Remand is necessary for the ALJ to consider how Claimant's activities of daily living affect the ALJ's decision regarding Claimant's subjective complaints.

Accordingly, I recommend the District Court reverse the ALJ's decision on this issue and remand the case for the ALJ to consider how Claimant's activities of daily living affect the ALJ's decision regarding Claimant's subjective complaints.

## C.    *The ALJ did not rely on a defective hypothetical.*

Claimant lastly argues that the ALJ relied upon a defective hypothetical.  The ALJ must assess a claimant's RFC and the demands of a claimant's past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv), 404.1520(a)(4)(iv).  If a claimant can still perform past

relevant work, the claimant is not disabled. *Id.* To assist in this determination, "a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work." 20 C.F.R. § 404.1560(b)(2).

"A vocational expert's testimony based on a properly phrased hypothetical question constitutes substantial evidence." *Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005) (quotation omitted). "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true." *Id.* "The hypothetical question must capture the concrete consequences of the claimant's deficiencies" but "may exclude any alleged impairments that [the ALJ] has properly rejected as untrue or unsubstantiated." *Perkins v. Astrue*, 648 F.3d 892, 901-02 (8th Cir. 2011) (quotations omitted).

At the hearing for this case, the ALJ posed a hypothetical to VE Stephen Schill that assumed a person limited to sedentary exertion as defined in SSA regulations[13] with the following additional limitations:

> no more than occasional balancing, stooping, kneeling, crouching, crawling, or climbing of ramps and stairs; the person should not climb ropes, ladders, or scaffolds; the person should not be around workplace hazards such as moving mechanical parts or unprotected heights; the person should not be around extreme temperatures or pulmonary irritants such as dusts, odors, gases, or fumes; should not perform more than frequent fingering, feeling, and handling with the left non-dominant upper extremity; the person should not perform more than occasional pushing, pulling, or operation of

---

[13] Sedentary work involves lifting no more than 10 pounds at a time, walking and standing no more than 2 hours a day, and sitting for about 6 hours a day. SSR 83-10, 1983 WL 31251, at *5 (defining sedentary work); *see also* 20 C.F.R. §§ 404.1567(a), 416.967(a).

the foot controls with the lower left extremity; the person would be limited to no more than frequent visual accommodation or sharp focus. . . . [T]he person would require a cane for any periods of ambulation or being on their feet.

Mentally, the person is limited to simple, routine, repetitive tasks and instructions; should face no more than occasional social interaction with coworkers, supervisors, or the public; should face no more than occasional changes in the workplace environment or routine; and then could not perform assembly line, fast-paced, high-production quota type work.

(AR at 71-72.) The VE testified that appropriate unskilled sedentary jobs for this person would be addresser, with 16,000 jobs in the national economy; document preparer, with 28,000 jobs in the national economy; and polisher of eye frames, with 21,000 jobs in the national economy. (*Id.* at 72-73.)

The ALJ then added the following restrictions to the hypothetical: "For hypo two, the same person could perform no more than 10 minutes of interrupted standing or 30 minutes of uninterrupted sitting without a brief change in position, would that eliminate those jobs or any other jobs?" (*Id.* at 73.) The VE testified, "I don't think so, Your Honor." (*Id.*) The ALJ and the VE then had the following exchange:

| ALJ: | And then if I moved to hypothetical three, if the same person in hypothetical one would miss up to four days of work per month on an unscheduled basis and/or be off task throughout the day up to two hours or 25 percent of the workday, would either of those independently eliminate all jobs? |
| VE: | Yes, they would, Your Honor. |
| ALJ: | Is that based on the DOT? |
| VE: | It's based on professional experience. |
| ALJ: | All right. And I didn't ask you that about the answer to number two on the sit/stand option. Is that based upon the DOT? |
| VE: | No, it's based on professional experience. |

| ALJ: | All right. All right. Counsel, again I was paraphrasing 20 and 21F from Dr. [Meis.] There were other limitations too, but the off task is enough in hypo three. |

(*Id.* at 73-74.) Claimant's attorney then cross-examined VE Schill. (*Id.*)

| Attorney: | Mr. [Schill], if we assume the first hypothetical that the judge gave you, but then assume in addition to that that Mr. Klingbeil has a further restriction relative to being required to be redirected every hour in order to perform simple tasks, would he be able to perform any of the jobs that you have set forth previously if he had that further limitation? |
| VE: | No, he wouldn't and if he did, it would be an accommodation. |
| Attorney: | Now in terms of the performance of sedentary work as defined during the course of an eight-hour day as defined sedentary work would require Mr. Klingbeil to be able to stand up to a combined two hours during the course of that day? |
| VE: | That's correct. |
| Attorney: | All right. If Mr. Klingbeil was unable in an eight-hour workday to stand any more than say an hour and a half, by definition, he would not be able to do unskilled, sedentary work or any other type of sedentary work, is that correct? |
| VE: | That is correct. He'd be below the sedentary level. |
| Attorney: | All right. And likewise if he would need to take extended breaks of 20 minutes or more multiple times per day away from sitting and standing, would that eliminate all sedentary, unskilled jobs as well? |
| VE: | It would, but if it was it'd be an again, it'd be an accommodation for an employer to allow that. |
| Attorney: | Now in terms of the addresser and document preparer and polisher of eye frames, those jobs—are those jobs that require sitting and standing or both or how are they defined? |
| VE: | Well, they're sedentary work. They require at least sitting six hours a day and standing two hours or less. |
| ALJ: | Thank you, sir. Appreciate your questions. |

(*Id.* at 74-75.) The ALJ concluded that Claimant is not capable of performing any of his past relevant work. (*Id.* at 20.) However, the ALJ also concluded that Claimant can

perform other work that exists in significant numbers in the national economy. (*Id.* at 20-21.) Specifically, the ALJ determined that Claimant can perform the jobs of addresser, with 16,000 jobs in the national economy; document preparer, with 28,000 jobs in the national economy; and polisher of eye frames, with 21,000 jobs in the national economy. (*Id.* at 21.)

Claimant alleges the ALJ relied upon a defective hypothetical for two reasons: (1) the RFC upon which the hypotheticals were based omitted "unrefuted restrictions contained in Dr. Meis' reports which further reduce [Claimant's] capacity to be competitively employed" and (2) "that even if the findings [of the ALJ] were supported by the evidence, such restrictions would dictate a finding of disability since the factual restrictions would dictate a finding of inability to engage in competitive employment."[14] (Doc. 13 at 10-11.)

First, the ALJ properly evaluated Dr. Meis's medical opinion and concluded the opinion should be afforded little weight as it was inconsistent with the record as a whole. Therefore, the ALJ was not required to include properly rejected alleged impairments from Dr. Meis's opinion in the hypothetical. "An ALJ must include 'only those impairments and limitations he found to be supported by the evidence as a whole in his hypothetical to the vocational expert.'" *Nash v. Comm'r, Soc. Sec. Admin.,* 907 F.3d 1086, 1090 (8th Cir. 2018) (quoting *Perkins*, 648 F.3d at 902); *see also Prosch v. Apfel*, 201 F.3d 1010, 1015 (8th Cir. 2000) (the ALJ was not required to include in the hypothetical impairments from a doctor's opinion that the ALJ properly rejected).

---

[14] Plaintiff seems to cite *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000), for the proposition that the ALJ did not "satisfy his duty to fully and fairly develop the record" when the ALJ relied on the opinions of non-treating, non-examining physicians to produce the RFC. (Doc. 13 at 8.) *Nevland* held that an ALJ may not rely exclusively on the opinions of non-examining physicians when crafting an RFC. *Id.* at 858. In this case, the ALJ relied on the opinions of examining medical professionals, medical records, Claimant's testimony, and other evidence to craft the RFC. (AR at 13-19.) Thus, *Nevland* is distinguishable from the case at bar.

Second, Claimant does not indicate what restrictions are allegedly "unrefuted." The ALJ included in the hypothetical "all impairments that were accepted by the ALJ as true and excluded other alleged impairments that the ALJ had reason to discredit." *Pearsall v. Massanari*, 274 F.3d 1211, 1220 (8th Cir. 2001) (citation omitted).

Third, the Commissioner may rely on a VE's responses to a "properly formulated hypothetical question" to meet his burden of showing that jobs exist that a person with the claimant's RFC can perform. *See Gann v. Berryhill*, 864 F.3d 947, 952 (8th Cir. 2017) (citations omitted); *Anderson v. Comm'r of Soc. Sec.,* No. 18-CV-24-LRR, 2019 WL 1212127, at *3 (N.D. Iowa Feb. 19, 2019). VE testimony will only constitute substantial evidence if the hypothetical question "comprehensively describes the limitations on a claimant's ability to function." *Gann*, 864 F.3d at 952. After that, an ALJ may rely on the VE's testimony as long as some of the jobs identified by the VE satisfy the claimant's RFC. *Grable v. Colvin*, 770 F.3d 1196, 1202 (8th Cir. 2014) (citing *Weiler v. Apfel,* 179 F.3d 1107, 1110–111 (8th Cir.1999)).

In the case at bar, the ALJ proffered hypotheticals that included the limitations he found supported by the record as a whole and then relied on the VE's responses to those hypotheticals when concluding there were jobs available in the national economy that Claimant could perform. As discussed above, the severe impairments included in Dr. Meis's opinions were not supported by the record as a whole. Therefore, the ALJ properly rejected the hypotheticals based on those impairments and the inclusion of those impairments in the final RFC. (AR at 21.) I find that the ALJ properly explained his reasons for rejecting the inclusion of additional impairments in the RFC. *See Nash,* 907 F.3d at 1090.

Accordingly, I recommend that the District Court affirm the ALJ's decision on this issue. **I further recommend** that the District Court order that **if the ALJ finds on remand that Claimant's subjective complaints have merit**, the District Court instruct

the ALJ to conduct a new hearing for the purpose of taking the testimony of a vocational expert regarding Claimant's ability to work with his new RFC that includes Claimant's subjective complaints.

## IV.  CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm in part and reverse and remand in part the decision of the ALJ**. **I further recommend that the District Court order** that if the ALJ finds on remand that Claimant's subjective complaints have merit, **the District Court instruct the ALJ to conduct a new hearing for the purpose of taking the testimony of a vocational expert** regarding Claimant's ability to work with his new RFC that includes Claimant's subjective complaints.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 16th day of August, 2019.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa